2025 IL App (1st) 242366-U

FIRST DIVISION
September 15, 2025

No. 1-24-2366

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* Su.D. and Sk.D., Minors | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 24 JA 484 and |
| | ) | 24 JA 485 |
| v. | ) | |
| | ) | |
| GREGORY D., | ) | Honorable |
| | ) | Patrick Murphy, |
| Respondent-Appellant.) | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: We affirm the judgment of the circuit court. The State adequately proved its claims that the minors were neglected, and the variance between the allegations in the pleading and the proof at trial does not justify setting aside the trial court's finding of neglect. The trial court's finding that an injurious environment existed is not against the manifest weight of the evidence and its description of respondent as "evil" does not constitute reversible error. The trial court had jurisdiction to make the minors wards of the court following a disposition hearing as it had already adjudged the minors neglected following the adjudication hearing.

¶ 2    Respondent Gregory D. appeals the circuit court's order finding that his minor children

Su.D. and Sk.D. were neglected under the terms of the Juvenile Court Act (705 ILCS 405/1-1 *et*

*seq*. (West 2022)). Following an adjudication hearing, the trial court found the minors to be

neglected because their environment was injurious to their welfare. See 705 ILCS 405/2-3(1)(b) (West 2022). Respondent appeals from the dispositional order arguing that: (1) the State failed to prove the allegations set forth in the petitions for adjudications of wardship; (2) the trial court erred when it found respondent created an injurious environment; and (3) the trial court did not have jurisdiction to make the minors wards of the court because the adjudication petition did not give him adequate notice or there was insufficient evidence to sustain the adjudication finding. Finding no reversible error, we affirm.

¶ 3                                    BACKGROUND

¶ 4      Respondent Gregory D. is the father of Su.D. and Sk.D. Su.D. was born on April 15, 2023, and Sk.D. was born on May 20, 2024. The children's mother, Jene'a C., has five other children, whose fathers are not respondent: Zealiyah R., who was 19 years old at the time relevant to this case, J.R. (age 14), D.V. (age 10), P.V. (age 7), and J.H. (age 4).

¶ 5      On July 6, 2024, when Su.D. was one year old and Sk.D. was two months old, police were called to the residence where respondent, Jene'a C., and the minor children lived. When police arrived, J.R., D.V., and P.V. were hiding in the bushes outside the home. The children told the responding officer that respondent and their mother were in a fight and respondent was swinging a knife around, smashing and breaking things in the home, and threatening the children saying "which one of you wants to die tonight." J.R., D.V., and P.V. fled the home and went to a neighbor's house. The neighbor kept the children for a period of time and then sent them home, but the children did not go home and instead hid in the bushes. The neighbor called the police.

¶ 6      When the responding officer arrived, he found the children hiding in the bushes and spoke to them. The children informed the officer that there was a domestic incident occurring at the home and they felt unsafe and they were hungry, so they went to the neighbor's house to eat

and find refuge. The officer noticed that the children were afraid, upset, and were wearing dirty clothes. They were visibly nervous and were shaking. The children would not look at the officer but were instead preoccupied with looking in the direction of the home.

¶ 7 When the responding officer approached the residence, there was music blasting, so he had difficulty making contact with respondent and the children's mother. The officer observed that, outside of the home, there were very tall weeds and debris was strewn about. When Jene'a C. answered the door, the officer observed that the residence was dirty and unkempt. There were roaches present on the walls and the floors, and dirty dishes were piled up in the kitchen. The officer asked Jene'a C. if she knew where the children were, but she initially stated that she did not know, even though it was 9:30 p.m. The neighbor joined the conversation and Jene'a C. then stated that the children had gone to the neighbor's house for dinner and the neighbor had picked them up. The neighbor disputed this version of events, and an argument ensued. Respondent came to the door at this time.

¶ 8 The officer spoke to respondent who was unable to tell the officer where the children were. Respondent denied any involvement in a domestic violence incident. The officer decided to take protective custody of J.R., D.V., and P.V and he brought them to the police station. The officer returned to the home the following day, July 7, 2024, and took Su.D. and Sk.D. into protective custody as well.

¶ 9 On July 9, 2024, the State filed petitions for adjudications of wardship for Su.D. and Sk.D. In the petitions, the State claimed that both children were neglected and abused in that their environment was injurious to their welfare. The State alleged that there was an ongoing issue of domestic violence between the parents while the children were present. The State cited the July 6, 2024 incident where respondent and the children's mother were involved in a physical

altercation. The State also pointed out that respondent was in possession of a knife during that incident and he threatened to harm Su.D. and Sk.D.'s siblings. The State noted that Su.D. and Sk.D.'s siblings are fearful of respondent. The State claimed in the petitions that both children were also at a substantial risk of physical injury based on the same allegations.

¶ 10    Also on July 9, 2024, the State filed motions for temporary custody of Su.D. and Sk.D. The State claimed in the motions that there was an immediate and urgent necessity to take the children into temporary custody for the same reasons the State sought to have the children adjudged wards of the court. The State's motions for temporary custody were granted and Su.D. and Sk.D. were ordered to be removed from the home.

¶ 11    The case subsequently proceeded to the adjudication hearing on September 24, 2024. The State first called Zealiyah R. to testify. Zealiyah R. was 19 years old at the time of the events relevant to this case and she would sometimes stay at her mother's house and sometimes stay elsewhere. Zealiyah testified about an incident that occurred on June 17, 2024 that is not discussed in the petitions for adjudication of wardship. On June 17th, Zealiyah was in the living room of her mother's home with two of her other siblings, J.R. (age 14) and J.H. (age 4). Zealiyah heard her mother and respondent begin to argue in the kitchen. Thereafter, Zealiyah witnessed respondent begin to walk around the house and break things while yelling about her and her siblings. Zealiyah testified that respondent said he was going to shoot her and her siblings and that their grandmother could not save them. Jene'a C. went to the bedroom and was with Su.D. and Sk.D. while respondent was breaking things and making threats against the other children.

¶ 12    Zealiyah testified that J.R. became nervous after respondent knocked over a large dresser, and J.R. fled the house. Zealiyah went out to look for J.R., called her grandmother, and then

called the police. According to Zealiyah, this was the first time respondent had threatened to kill her and her siblings, but J.R., D.V., and P.V. told her about other incidents like this one that had happened before. A few weeks earlier, J.R. had told Zealiyah about an incident where their mother and respondent were fighting and they broke things in the house while they argued. Zealiyah did not testify about the July 6, 2024 incident because after the incident on June 17th, she left the home and has not since returned.

¶ 13    The State then called DCFS Child Protection Investigator Christina Ferguson as a witness. Ferguson testified that she interviewed Jene'a C. and the children at their home on June 18, 2024, following the incident Zealiyah testified about on the prior day where the police were called to the home. The children denied that anything happened. Jene'a C. told Ferguson that respondent and Zealiyah had merely gotten into an argument. Respondent denied any involvement.

¶ 14    Sauk Village Police Officer Gary Luke testified about the events on July 6, 2024. He testified about being called to the home and finding three of the children hiding in the bushes. The children told Officer Luke about the fight between respondent and their mom, and that respondent had been breaking things in the house, damaging furniture, and threatening the children. They told the officer that respondent asked them "which one of them wanted to die today." The children felt unsafe and they were hungry, so they went to the neighbor's house. Officer Luke also testified about the unsanitary conditions at the home. The officer stated that as he was standing on the front porch talking to respondent and Jene'a C., he was surrounded by roaches and there were roaches on the floors and the walls of the home. He testified that when he spoke to respondent, respondent denied any involvement in a domestic violence incident.

¶ 15    The State called DCFS Child Protection Investigator Halema Townsend who was assigned to investigate following the July 6th incident where the police were called. On July 7, 2024, Townsend met with J.D., D.V., and P.V. while they were at the Sauk Village Police station. Townsend observed the children to be trembling, withdrawn, and nervous. The children had an unkempt appearance, and they were visibly scared.

¶ 16    Fourteen-year-old J.D. told Townsend that they fled the home because respondent threatened to kill them. J.D. told her that respondent drinks alcohol, yells a lot, and he had previously witnessed respondent and his mother fight physically. J.D. did not report this information to the previous DCFS investigator because he was scared. Ten-year-old D.V. told Townsend that she and her siblings fled the home because respondent threatened them and they were afraid. D.V. stated that respondent was threatening to kill all of the children and leave just one of them alive. Six-year-old P.V. told Townsend that respondent and her mother were arguing. P.V. stated that she was afraid of respondent.

¶ 17    After speaking with J.D., D.V., and P.V., Townsend asked the police to bring Jene'a C., respondent, and the other children to the police station. Jene'a C. denied that she and respondent had been in any argument the day before. Respondent also denied any fighting or arguing on that date, telling Townsend that it was instead "one of the most peaceful days the family had had." Respondent stated that a neighbor had come over to the house around noon on July 6th and asked if she could take the children. Respondent told Townsend that J.D., D.V., and P.V. are known to lie and they often went out into the community begging for food.

¶ 18    Townsend testified that neither Su.D. or Sk.D. showed any signs of abuse or neglect, but she believed the young girls were nevertheless at risk in that injurious environment. The State rested its case.

¶ 19    Respondent testified that on July 6, 2024 he was at home cleaning and barbecuing with Jene'a C. and the children. Respondent did not see J.D., D.V., and P.V. after 11:30 a.m. that day because he was busy. Respondent testified that the children were upset that day because they were supposed to go to a pool party, but their aunt who was supposed to take them there cancelled. Respondent denied that he and Jene'a C. were arguing and instead testified that everything was peaceful.

¶ 20    On cross-examination, respondent admitted that he has 10 children and does not have custody of any of them. He admitted that DCFS in Will County had removed his other children from his care in a child protection case. Respondent rested his case following his testimony.

¶ 21    The State argued in closing that the minors' environment was injurious to their welfare and created a substantial risk of physical injury because they were exposed to domestic violence at home. The State highlighted the threats respondent made to Su.D. and Sk.D.'s siblings, noting that respondent specifically and repeatedly threatened to kill the children. The guardian *ad litem* argued that Su.D. and Sk.D. were part of a neglectful and harmful environment, but they could not verbalize it because they were not old enough yet to speak.

¶ 22    During DCFS Investigator Townsend's testimony and during the State's closing argument, the trial court interjected to ask if respondent could maybe be viewed as just the evil stepfather, in that he treated J.D., D.V., and P.V. badly, but that he treated his own kids Su.D. and Sk.D better. The trial court asked the State during its closing if maybe respondent said he was going to kill the children, but did not really mean it, and the court asked if the State was arguing Su.D. and Sk.D. were neglected simply because respondent was "an evil stepfather" to the other three children.

¶ 23    Respondent argued in closing that Su.D. and Sk.D. showed no signs of abuse or neglect. Respondent contended that J.D., D.V., and P.V. were upset that they did not get to go to the pool party they were supposed to attend. Respondent argued that the State did not meet its burden as there was only one alleged threatening statement over the course of four years and no signs that the children had ever been physically abused.

¶ 24    The trial court found Su.D. and Sk.D. were neglected due to an environment injurious to their welfare based on the totality of the evidence. The trial court noted that sometimes people might say "I'm going to kill you" and not mean it, but when "a parent who has been an evil parent says 'I'm going to kill you,' you take it seriously." The trial court found respondent to be "out of control" and made a finding of neglect based on an environment injurious to the children's welfare.

¶ 25    After Su.D. and Sk.D. were adjudged to be neglected, the case proceeded to a disposition hearing. The trial court received exhibits into evidence and heard testimony about the children's placement with relatives. The court received updates on the children's wellbeing and on Jene'a C. and respondent's activity since the children had been taken from the home. The DCFS caseworker, Bessie Miles, testified the agency recommended that Su.D. and Sk.D. be made wards of the court and placed in DCFS custody with the goal of the children returning home in 12 months.

¶ 26    The trial court agreed with DCFS's recommendation and ordered Su.D. and Sk.D. to be wards of the court. The trial court granted DCFS custody as the children's guardian with the right to place the children in a suitable home setting. Respondent filed this appeal of the trial court's adjudication and disposition findings and orders.

¶ 27                                ANALYSIS

¶ 28    First, respondent argues that the State failed to prove the allegations set forth in the petitions for adjudications of wardship. Second, respondent argues that the trial court erred when it found respondent created an injurious environment in his capacity as an "evil" person who threatened to kill the minors' siblings as there was no evidence presented that respondent is "evil." Third, respondent argues that the trial court did not have jurisdiction to determine the disposition of the minors and make them wards of the court because there was insufficient evidence they were abused or neglected.

¶ 29    I. Failure to Prove Allegations in Petitions for Adjudication of Wardship

¶ 30    Respondent argues that the State failed to prove its claims that Su.D. and Sk.D. were abused or neglected because there was no evidence offered at trial to support the specific factual allegations set forth in the petitions for adjudication of wardship. Specifically, in the petitions seeking adjudications of wardship for Su.D. and Sk.D. the State made two claims: (1) that the minors were neglected under section 405/2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2022)); and (2) that the minors were abused under section 405/2-3(2)(ii) of the Juvenile Court Act (705 ILCS 405/2-3(2)(ii) (West 2022)). The factual basis provided by the State to support both claims was the same.

> "There is an ongoing issue of domestic violence between the parents while the children are present. On or about June 6, 2024 [*sic*], parents were involved in a physical altercation with each other. [Respondent] had a knife during this incident. [Respondent] threatened to harm [the minors]' siblings during this altercation. [Minors'] siblings state that they are fearful of [respondent]. Mother and [respondent] reside together. ***"

¶ 31    Under section 405/2-3(1)(b) of the Juvenile Court Act a minor is deemed neglected when the court finds that her "environment is injurious to the minor's welfare." 705 ILCS 405/2-3(1)(b) (West 2022). Under section 405/2-3(2)(ii) a minor is deemed to be abused when the minor's parent or another person responsible for the minor's welfare "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2022).

¶ 32    Respondent argues that the State was required to prove the specific allegations set forth in the petitions for adjudication. He argues, however, that the State failed to produce evidence at the adjudication hearing that the minors' parents engaged in any physical altercation, "let alone that [respondent] wielded a knife while doing so and while threatening to harm the minors' siblings." Respondent points out that the "knife-wielding altercation" was not at all referenced or discussed during the adjudication hearing. According to respondent, because the State failed to prove the allegations in the petitions, the trial court was required to dismiss the petitions (citing *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004)). Respondent argues that the trial court erred where it went on to find the minors to be neglected based on evidence that respondent told the minors' other siblings in an isolated incident that he was going to kill them, but not while wielding a knife. Respondent points out that the trial court recognized respondent's statement could be a harmless expression under certain circumstances.

¶ 33    Respondent argues that the trial court's finding of neglect should be reversed because the State failed to prove the allegations actually set forth in the adjudication petitions and because respondent was not given proper notice of the allegations eventually used to find the minors to be neglected. Respondent points out that the State never moved to amend the petitions either before

or after the adjudication hearing to perhaps make the pleadings conform to the proof in order to ameliorate the error and save the deficient pleading.

¶ 34    Both the State and the minors' through their guardian *ad litem* argue that respondent waived any challenge to the variance between the pleadings and the proof by failing to raise the issue in the trial court. The State argues that "[a]ll defects in pleading, either in form or substance, not objected to in the trial court are waived" (citing 735 ILCS 5/2-612(c) (West 2022)). The Juvenile Court Act permits an adjudication petition to be amended to conform with the evidence "at any time prior to ruling." 705 ILCS 405/2-13(5) (West 2022). According to the State, "[h]ad respondent brought the discrepancy to the attention of the juvenile court, the matter could have easily been corrected," but his untimely objection made for the first time on appeal is statutorily prohibited and impedes the prompt, just, and final resolution of the minors' case.

¶ 35    The parties' arguments on appeal reveal that there are two real areas of contention with regard to the variance between the pleadings and the proof. The first issue is that the adjudication petitions described one of the alleged events of neglect or abuse as occurring on June 6, 2024. There is no real dispute that the recitation of this date was a clerical error as the alleged event of neglect or abuse occurred on *July* 6, 2024.

¶ 36    To the extent respondent's challenge to the trial court's finding of neglect is based on the State's failure to prove any neglectful act on June 6, 2024, we find the argument to be waived. See 735 ILCS 5/2-612(c) (West 2022) ("all defects in pleadings, either in form or substance, not objected to in the trial court are waived."). At the adjudication hearing, the parties all proceeded with knowledge that the relevant incident occurred on July 6, 2024. Respondent himself introduced evidence about the circumstances of the day on July 6th and none of the parties ever discussed June 6th. The State filed a motion for temporary custody of the minors at the same

time it filed its petitions for adjudication of wardship and the motion for temporary custody contains the correct date. This discrepancy is one that could have easily been corrected if it was brought to the attention of the trial court or the State and it had no effect on respondent's substantive rights. With regard to the date discrepancy, respondent's argument is procedurally barred, and we reject it. See *In re J.F.*, 325 Ill. App. 3d 812, 818 (2001) (respondent's failure to object to a clerical error that caused a variance between the pleadings and the proof was waived where it was raised for the first time on appeal).

¶ 37    The second issue concerning the pleadings and the proof is that, setting aside the date discrepancy, the State did not prove the substantive allegations of the petition and instead produced testimony about unpleaded events to prove Su.D. and Sk.D. were neglected. The State frames the issue as purely procedural—it is a challenge to the variance between the pleadings and proof that respondent was required to raise in the trial court. Respondent frames the issue a bit differently. Respondent's contention is that there is not any issue with the pleading itself per se. He acknowledges the petition states a cause of action, appropriately identifies the statutes relied upon, appropriately identifies the remedy sought, and alleges sufficient facts. Respondent's challenge is not to the pleading itself, but rather to the fact that the State did not prove the allegations in its petition. According to respondent, the State did not prove at the hearing that he threatened Su.D. and Sk.D.'s siblings with physical harm during a physical altercation with their mother while wielding a knife—the factual basis upon which the State brought the petition to claim the minors were neglected. According to respondent, it is a failure of evidence not a failure of pleading that warrants setting aside the trial court's finding of neglect.

¶ 38    We agree with respondent that this issue is not waived for review. He is challenging

whether the State met its burden of proving the allegations in the adjudication petition. Respondent argued during the hearing that the State did not meet its burden, and he has not waived his right to challenge the supposed lack of proof on appeal. See *In re Arthur H.*, 212 Ill. 2d 441, 477-78 (2004) (emphasizing that the State must be held to its burden of proof and, where the State fails to produce evidence to support the allegations in its adjudication petition, the finding of neglect cannot stand and the petition must be dismissed). A litigant does not forfeit the ability to argue on appeal that the other party failed to prove its case, even if the issue is not raised in the trial court.

¶ 39    These proceedings are considered to be civil in nature and are governed by civil appellate rules. *In the Interest of Christenberry*, 69 Ill. App. 3d 565, 567 (1979). In civil, non-jury cases, "the sufficiency of the evidence to support the judgment is subject to review without formal action to preserve the question." Ill. S. Ct. R 366(b)(3)(i); see also *City of Chicago v. Abdullah*, 76 Ill. App. 3d 325, 329 (1979) (failure to raise the issue that there was insufficient evidence to support the judgment did not preclude review on appeal); *People v. Woods*, 214 Ill. 2d 455, 470 (2005) ("when a defendant makes a challenge to the sufficiency of the evidence, his or her claim is not subject to the waiver rule and may be raised for the first time on direct appeal."). Accordingly, we address respondent's argument that he is entitled to relief based on a failure of proof.

¶ 40    In the adjudication petition in this case, the State alleged that Su.D. and Sk.D. were neglected under section 405/2-3(1)(b) of the Juvenile Court Act because the minors were in an environment injurious to their welfare. See 705 ILCS 405/2-3(1)(b) (West 2022). The State alleged that the minors were in such an injurious environment because "there is an ongoing issue of domestic violence between the parents while the children are present." The State continued by

specifically alleging that, "[o]n or about June 6, 2024 [*sic*], parents were involved in a physical altercation with each other [, respondent] had a knife during this incident [, and respondent] threatened to harm [the minors]' siblings during this altercation." The State concluded by alleging that [the minors'] siblings state that they are fearful of [respondent, and] Mother and [respondent] reside together. ***"

¶ 41 The State presented testimony from Sauk Village Police Officer Gary Lukes and DCFS Investigator Halema Townsend who both testified that respondent made threats to the children's lives while also engaging in a fight with the children's mother. The State introduced evidence during the adjudication hearing that respondent and the children's mother engaged in multiple domestic altercations while the children were present and that respondent threatened to harm the minors' siblings during an altercation with Jene'a C. on July 6, 2024 which made the minors' siblings feel afraid. There was evidence respondent threatened the lives and safety of the minors' siblings on both June 17, 2024 and July 6, 2024.

¶ 42 The evidence shows Su.D. and Sk.D. were living in an environment of ongoing domestic violence in their home. The evidence showed more than just one isolated incident as claimed by respondent: there was evidence of multiple domestic disputes between respondent and Jene'a C. along with evidence of respondent's history as DCFS had removed other children from his care for purposes of child protection. We have previously explained that "living in an atmosphere of domestic violence is undoubtedly injurious to a child's welfare." *Plowman v. Department of Children & Family Services*, 2017 IL App (1st) 160860, ¶ 22.

¶ 43 Moreover, there was evidence of respondent making threats to kill Zealiyah R., J.D., D.V., and P.V. The evidence showed respondent made threats to kill one or more of the children on multiple occasions in close temporal proximity. The children expressed real fear following the

threats. The threatening words were accompanied by respondent yelling, damaging furniture, and breaking things in the home. J.D., D.V., and P.V. elected to flee the home on July 6, 2024 out of fear and they took refuge with a neighbor before hiding in the bushes. Su.D. and Sk.D. were inside the home on both of these occasions. The Juvenile Court Act provides that proof of the neglect of one child is admissible to prove the neglect of any other children for whom the parent is responsible. 705 ILCS 405/2-18(3) (West 2022). Su.D. and Sk.D. lived in the same home as J.R., D.V., and P.V., and, thus, they were in the same injurious environment that the court deemed injurious for the older children.

¶ 44    The State proved by a preponderance of the evidence that Su.D. and Sk.D. were in an injurious environment and could be adjudged neglected under the Juvenile Court Act. See 705 ILCS 405/2-3(1)(b) (West 2022). The trial court's finding was not against the manifest weight of the evidence as the totality of the evidence does not establish that the opposite conclusion is clearly evident. See *In re A.W.*, 231 Ill. 2d 241, 261 (2008). The State was not required to prove its allegation that respondent was armed with a knife in order to meet its burden of proving an injurious environment. Indeed, to meet its burden, the State is not required to prove each factual allegation in the petition. *In re Jeh. R.*, 2023 IL App (1st) 230006, ¶ 62.

¶ 45    Respondent suggests that his due process rights were violated because the allegations of the petition were not the same as the evidence that supported the trial court's finding of neglect. The essential test of the sufficiency of a State's petition is whether it reasonably informs a respondent of a valid claim against him. *In re Dominique W.*, 347 Ill. App. 3d 557, 565 (2004). Here, respondent had sufficient notice of the allegations of neglect and ample opportunity to investigate and present evidence in defense to those allegations. Respondent was advised by the pleading that the State was claiming an injurious environment based on, among other things, an

ongoing issue of domestic violence, respondent's threats to harm the minors' siblings, and the fact that the minors' siblings were fearful of him. The pleading was sufficient to apprise respondent of what he was called to answer and to adequately prepare for the hearing. See *In re Harpman*, 146 Ill. App. 3d 504, 512 (1986); *In re Z.L.*, 2021 IL 126931, ¶¶ 89-91.

¶ 46    Accordingly, we reject respondent's argument that the adjudication petition should have been dismissed or that the State failed to meet its burden of proving neglect as set forth in the petitions for adjudication of wardship.

¶ 47    II. Finding an Injurious Environment, Particularly Based on Respondent Being "Evil"

¶ 48    Respondent argues that the trial court erred by characterizing him as "evil." He contends that there was no evidence offered at the hearing tending to show that he was "evil." Respondent suggests that the evidence adduced at the adjudication hearing is very much to the contrary of showing him to be a habitually aggressive or violent person.

¶ 49    Respondent argues that there was evidence of just two incidents to show the neglect or his evil qualities. For the first incident, related by the testimony of Zealiyah R., respondent suggests that the testimony should not be accorded much weight because she admitted it was the first time respondent had said anything like that, and the other children disclaimed any threat being made when they spoke to the DCFS investigator shortly after the incident and they told the investigator they "felt safe." For the second incident, related by the testimony of Officer Luke and DCFS Investigator Townsend, respondent suggests the testimony should be disregarded because it was all hearsay and was not corroborated.

¶ 50    Respondent acknowledges that hearsay is permitted in cases dealing with abused, neglected, or dependent minors but he argues that the statements were not corroborated as required. Under section 405/2-18 of the Juvenile Court Act, "[p]revious statements made by the

minor relating to any allegations of abuse or neglect shall be admissible in evidence." 705 ILCS 405/2-18(4)(c) (West 2022). However, "no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." *Id.*

¶ 51     Respondent tacitly acknowledges that he did not preserve this evidentiary error for review, and he invokes the plain error doctrine to save his forfeiture. *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 16 (a party's failure to raise an issue in the trial court results in a forfeiture of the issue for appeal). Respondent states that he "invokes the plain-error rule in seeking this Court's review of the issue," but he does not make any specific plain-error argument. A party forfeits plain error review when he fails to explain how the plain-error rule is satisfied. *People v. Leach*, 2012 IL 111534, ¶ 61.

¶ 52     Even if we were to set aside respondent's forfeiture, the hearsay statements introduced in the testimony of the police officer and DCFS investigator had various forms of corroboration. The hearsay statements were corroborated by the police officer and DCFS investigator's own observations of the children. See *In re Walter B.*, 227 Ill. App. 3d 746, 757 (1992) (an officer's observation of a minor crying after the event he described in the out-of-court statement is corroboration of the hearsay). Both witnesses testified about receiving the minor children's statements, but they also testified about the outward signs of fear they observed from those children as a result of the threats. The minors' hearsay statements were also corroborated by the other minors' statements which were all consistent. The minors' statements were further corroborated by their neighbor who spoke to Officer Luke and contradicted Jene'a C.'s explanation of the children's absence from the home at the time the police arrived. The hearsay statements were also corroborated by the testimony of Zealiyah R. In her testimony, Zealiyah described a similar incident where respondent was threatening her and her siblings with harm

just a few weeks prior to the July 6, 2024 incident described in the minors' hearsay statements. All of the above factors added weight or credibility to the minors' out-of-court statements and rendered the statements admissible for these proceedings. *In re Z.C.*, 2022 IL App (1st) 211399, ¶ 51.

¶ 53    Respondent highlights that he denied in his testimony that he ever threatened to kill Su.D. and Sk.D.'s minor siblings. He points out that the other evidence in the case supported his testimony that he never hit or otherwise physically abused the minor children during the four years he lived with them. Indeed, there was no evidence that respondent had ever physically abused any of the children. Respondent asserts that the instances where verbal threats such as "I'm going to kill you" have found to be sufficient to support a finding of neglect, the verbal statements have been coupled with a larger pattern of physical abuse. He contends that the evidence here only shows an isolated threat that had never been made before and could be construed to simply convey the intensity of his anger rather than an actual intent to kill or inflict bodily harm.

¶ 54    The argument respondent makes here is really a challenge to the trial court's fact finding after it heard the witnesses' testimony in a hearing. On appeal, we will not substitute our judgment for that of the trial court regarding the credibility of the witnesses, the weight to be given to the evidence, or the inferences to be drawn therefrom. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). The trial court found the testimony about the threats respondent made to be credible while finding respondent's denials incredible. We cannot second guess the trial court's findings to conclude that respondent was merely expressing anger when he threatened to kill the children rather than that his threats were serious.

¶ 55    There is no requirement that threatening statements such as the ones here must be

coupled with other instances of physical abuse in order to demonstrate an injurious environment for the children. "[O]ur courts have made clear that we need not wait until a child becomes a victim of physical abuse or permanent emotional damage before such a finding [of abuse or neglect] may be upheld." *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 39. The trial court found the statements to be serious leading to an injurious environment for the minors. The statements made by respondent were also more specific than simply "I'm going to kill you" as the evidence showed respondent said he would "kill all of them and leave one alive," asked the children on a different day "which one of them wanted to die today," and discussed shooting them in the face. The children understood these statements to be serious as evidenced by their reactions of fleeing the home, showing fear when the police arrived, and expressing to the DCFS investigator that they were scared of respondent. Moreover, there was evidence introduced at the hearing that respondent became angry on multiple occasions and began destroying things inside the home while making threats against the children. There was evidence introduced through DCFS Investigator Townsend that respondent drinks alcohol, that he and the children's mother would fight physically, and that the children were scared of him as a result of witnessing these displays of behavior. That evidence supports the conclusion that respondent's threats to kill the children were not baseless but a real possibility. The threat of violent acts occurring extended to all children in the home.

¶ 56 The trial court's characterization of respondent's conduct as evil or even if the trial court's statement could be construed as an insinuation that respondent himself is evil does not justify setting aside the finding of neglect. It appears the trial court's characterization was simply its way of expressing that respondent's threats were to be taken seriously rather than being taken as just an expression of frustration. Our task is to review the trial court's decision, not its

reasoning, and we may affirm on any basis in the record, regardless of whether the trial court relied on that basis or its reasoning was correct. *In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 34. Here, the State proved neglect stemming from an injurious environment by a preponderance of the evidence and respondent provides no basis for disturbing the trial court's finding of neglect.

¶ 57    III. Trial Court's Jurisdiction to Make the Minors Wards of the Court

¶ 58    Respondent argues that, if we find he was not sufficiently apprised of the allegations against him or the evidence at the hearing was insufficient, then we should find the trial court lacked jurisdiction to make the minors wards of the court (citing *Arthur H.,* 212 Ill. 2d at 464 (citing 705 ILCS 405/2-21(1)) ("A finding of abuse, neglect or dependence is jurisdictional, 'without [which] the trial court lacks jurisdiction to proceed to an adjudication of wardship' ")). However, as described above, we reject respondent's arguments that either the allegations or the evidence was insufficient. See *supra* ¶¶ 41-43, 45-46.

¶ 59    Section 2-21(2) of the Juvenile Court Act provides that, if the court determines that the minor is either neglected or abused, a dispositional hearing shall be held to determine whether it is consistent with the health, safety, and best interest of the minor that the minor be made a ward of the court. 705 ILCS 405/2-21(2) (West 2022). Without a finding of abuse, neglect, or dependence, the trial court lacks jurisdiction to proceed to adjudge a minor a ward of the court. *Arthur H.*, 212 Ill. 2d at 464. Here, the trial court adjudged the minors neglected and because respondent has failed to establish that the trial court's finding of neglect should be set aside, he cannot show that the court lacked jurisdiction to enter its subsequent disposition order.

¶ 60                                    CONCLUSION

¶ 61    Accordingly, we affirm.

¶ 62    Affirmed.